Thank you, Your Honor. May it please the Court, my name is William Gauss. I'm representing the appellant, Michael Drumm. And with the Court's permission, I'd like to try to at least reserve five minutes for rebuttal. I understand I have to keep my own time. We have two main issues in this case. The first is whether Morningstar, in particular his supervisor, Mr. Drumm's supervisor, Connie Resendez, knew or suspected about his sexual orientation. And the second issue is whether the reason advanced for his termination was pretextual, which was the pivotal issue in the district court. On the first issue, I think we have two overarching points that go to all of the evidence that we have. One is that words or actions, context matters in determining what those words or actions mean, sometimes more than the text of the words themselves. The second point is that people do things for a reason. Now, on the first point, before and after Mr. Drumm's termination, his supervisor said personal issues dragged down his performance in 2007. Now, after she made that observation as a justification, in part, for his termination after the fact, and she said after the fact, when I say personal issues, I mean personal matters taking up too much work time. But she attached five pages of documents supposedly illustrative of personal matters affecting his performance, and none of those five pages show him doing things during work time. They are all after hours, or one of them is during the lunch hour. And all of them show his relationship with another man. And therefore, context matters. What did she mean by personal issues? She meant his dating another man. Personal issues affected his performance. Now, at the time of his termination, she said personal issues have been dragging down his performance in 2007. At this time, she says, when I say personal issues, I mean issues surrounding his divorce and child care issues that are taking up his time and occupying his mind. However, the record shows in 2007, those issues did not exist. All the issues surrounding his divorce with his wife were finished. His child care responsibilities were greatly diminished, and they were all resolved. And equally significant, Ms. Resendez asked him very pointedly about some personal issues in 2007, and showed tremendous issue in some personal issues. And it was not, Mike, how's the divorce coming along, or how are you handling all the issues with your divorce? It was, what are you doing with your free time? And she showed a tremendous interest in this. And that's that, in our view, is also very significant on the issue of what she knew or suspected. And that goes to our second point. People do things for a reason. If people question someone insistently on a matter, it is because they want to know the answer. They think the answer is important to them. Well, the district court reviewed the submissions of both parties and essentially concluded that it was his performance on the job that was the cause of the, of what happened to him, and that his clients, the main clients of the company, were unhappy with him. And that's not a discriminatory reason for firing. So I guess I want to know where the district court went wrong. Oh, yes. The district court found that, although they found that we had shown that blaming him for one particular issue, the Morningstar's failure to provide red-line documents in their negotiations with the Schwab people, that we had presented evidence that that issue was a pretext, but concluded the district court that was only one of many issues that caused the problem. But the main point is that it was the job performance that was a problem, that the clients were complaining, and he was terminated for that reason. And what is wrong with that reasoning? What's the problem? Because the district court said there were a lot of issues concerning his performance, and where we showed pretext, it wasn't sufficiently substantial because we only show that one reason was pretextual. And maybe I should really go into this now in response. Well, what is there that shows that he was terminated for something other than job performance? The evidence is that the supposed job performance issues were imaginary. And the reason I say that is that the reason given the clients didn't complain. Your Honor, they did not until Ms. Resendez in the second case, in the Schwab case, clients did not complain until Ms. Resendez engineered a complaint by falsely blaming him for a major issue with Schwab. It's that simple. And what the record shows, and Ms. Resendez says, he worked all through 2007. Our evidence is September 30th, 2007, he is our number one performer. He has completed all of the substantive negotiations for the Schwab deal. Between that date and October 12th, two weeks later, something happens and he's on his way out the door. And Ms. Resendez says, October 1, no complaints from Schwab. And, in fact, we show in the record the principal Schwab negotiator actually says, up until the very last day of the relevant time period, October 12th, I was not making complaints about Michael Drumm. Our evidence shows that between October 1 and October 12, the Schwab deal, which was going along just fine, even according to Ms. Resendez, went almost completely sideways, and over one and only one issue, Morningstar was not giving Schwab red line documents. That's the issue identified by Mr. Drumm that he says torpedoed all the meetings in that relevant time period. That's the issue identified by Ms. Resendez's account of what happened in the relevant time period. And that is what the Schwab negotiator says. The problem we had in that relevant time period was we weren't getting red line documents and we were entitled to them. Substantial evidence shows, and maybe I should go back and say, in Ms. Goldman's deposition, and we quote this in our brief, she says, going into the final meeting, the one where I eventually learned that he was responsible for the red line problem, going into that meeting, I wasn't blaming Mr. Drumm for the problem. What I was mad about was the fact that we didn't have documents. I wasn't – I wasn't targeting Mr. Drumm for this problem. And that's her deposition, page 28. That's in the supplemental excerpts of record 226. And then the following pages, which are in our excerpt of record, Ms. Goldman says, following that meeting, October 12th, I talked to Ms. Resendez, and I concluded that Mr. Drumm was the weak link in this whole process. And the only issue, let me just say again, was the failure to get red line documents. This was the issue that was torpedoing all these meetings. I'm looking at page 64 of the deposition, and the answer is, I would say, Mike, consistently underperformed during the renewal process, missed deadlines, and did not respond to requests that we made. But she didn't say that to Ms. Resendez. And she did not complain to Ms. Resendez about anything during the renewal process, according to Ms. Resendez, until the October 12th time period, when she asked him to be removed. And what made her ask for his removal? According to Ms. Goldman, Connie told me it was Mike's responsibility to provide me with those documents. Prior to the meeting, she is not asking for Mr. Drumm's removal. She's not complaining about him at all. And she is, and she's complaining. She's saying this whole deal is going away because of this red line issue. And then Ms. Resendez says, well, actually, that's all Mike's responsibility. There's no question they were worried about this. I beg your pardon? There's no question that they were worried about the Schwab, these big contracts. Right. And it was part of his job to see that they went, that things went well and they didn't go well. Mm-hmm. What, I guess, let me put it the other way, what is there, then, that indicates that it was as if this was on account of sexual orientation rather than on account of his job performance? Well, I'll say again. I think I've tried to explain why. You've tried to say, well, this doesn't quite jibe. The ---- I'm not saying that it's contextual for something, but what ---- how do we know what that, what was? I am saying that Ms. Resendez, her statements after his termination, that's what I was going into at first. She identified documents showing his sexual orientation as explaining his supposed decline in job performance, and that prior to, prior to his termination, she again said personal issues are affecting his job performance. And what she identified as the supposed personal issues don't make any sense. They weren't personal issues at that time. They were all resolved. And the only issue she asked about was what are you doing during your free time, and she asked about it insistently. And an insistent demand for information shows that the questioner wants the information. People do things for a reason. And what we're ---- and with respect to the other client who supposedly complained, we have given the Court substantial evidence showing that the ---- the Ms. Resendez was completely happy at the time that she says she was taking him off the account because of bad performance, that she was completely happy with his performance. Mr. Drum says so. We have documents authored by Ms. Resendez at the time that show that she has no interest in taking him off this account that she's supposedly removing him from for poor performance. That ---- that shows that the reason she's giving is pretextual. If the contemporaneous documents show that she has ---- that she's happy with his performance, and a year later, when he's now living alone as a gay man, she says, come to think of it, a year ago I kicked him off the account, when contemporaneous documents show she didn't, that's a pretextual reason. Good morning. May it please the Court. My name is William Percorning. I represent the Defendant Appellee Morningstar. We essentially agree with Mr. Gauss as to the two key questions that are at issue in this case. Number one, did Mr. Drum present evidence from which a reasonable jury could conclude that there was ---- that those involved in his discharge knew or suspected that he was gay at the time of that decision? And secondly, did Mr. Drum present evidence, again, from which a reasonable jury could conclude that the reasons stated for his discharge were pretext for sexual orientation discrimination? Unlike Mr. Gauss, we respectfully submit the answer to both those questions is no. It's undisputed that at the time of his discharge, Mr. Drum had not told anyone at Morningstar that he was gay, not his friends, not his supervisors. It's undisputed that the two individuals ultimately responsible for the decision to terminate Mr. Drum's employment, Tao Hung and Elizabeth Kersher, didn't know that he was gay. In fact, he was previously married, had two biological children with his wife, and as far as they knew, he was heterosexual. The only question with respect to that issue is whether Ms. Resendez, his immediate supervisor, was aware that he was gay. And we submit that the evidence in the record does not establish that she had any such knowledge or that she even suspected that he was gay. And as to the question of pretext, it's, again, undisputed that two significant clients, including Mr. Drum's most significant account, the Charles Schwab account, asked for his removal from their accounts. Mr. Drum characterizes those as stemming from a single issue relating to the red line with respect to the Charles Schwab account. But the evidence shows that there were other issues that were concerning Randy Goldman, the Charles Schwab representative. So, again, we submit that the answer to both the questions that are at issue is no. If Ms. Resendez knew or suspected that he was gay, is that enough for the plaintiffs to get a survivor summary judgment? Well, we submit the answer to that is no as well, Your Honor. Ms. Resendez, again, was not the final decision maker. She was not even consulted by Mr. Hong and Ms. Kersher when they made the decision to terminate Mr. Drum's employment. She conveyed to them that his inadequacies, no? So, I mean. What she conveyed to them, Your Honor, is that Randy Goldman asked for Mr. Drum to be taken off her account, the Charles Schwab account. She conveyed that she asked for another account representative, Diane Wine, to be assigned to that account. She conveyed that Ms. Wine had also taken over the E-Trade account. She didn't criticize Mr. Drum's performance on either account. She didn't go into any details as to the reasons for those requests from the clients. She simply said the clients requested it. And with respect to the E-Trade account, she chalked it up to a, I believe the wording was something along the lines of a poor fit. So she didn't criticize his performance in that one e-mail that they were considering when they made the decision to terminate. But the evidence shows that Mr. Hong, from his prior knowledge of Mr. Drum, had a low opinion of his ability as a salesman. And given these two issues with very significant clients, including Mr. Drum's most significant account, he and Ms. Kirscher, before they went back and again got additional detail, reached the decision that Mr. Drum's employment should be terminated, because, again, two significant clients were asking for his removal from their accounts. And Mr. Drum admitted in his deposition that he's a salesman. His job is to serve as, in his words, the face of the account. So when he has two clients who are saying, regardless of what the underlying reason is, but the two clients are saying, we don't like him, we want him to be replaced with somebody else, that's a serious concern for Morningstar Management. It's a legitimate, non-discriminatory concern. And there were ample reasons for them to make that decision that, look, we can't continue to risk client relationships with this individual who, this individual who had no idea Mr. Drum was homosexual. Yes. Sotomayor Let me ask you this. Suppose that they did know. Suppose that they knew that the problems that he was having, that were distracting him from the work, were related to his sexual orientation and the adjustments that he was having to make in his personal life. Would that be sufficient to, and everything else in the record is the same, would that, and the clients are complaining about the performance. Is there a genuine issue of material fact in that situation? No, we don't think so, Your Honor. Again, there may be an issue as to whether he's established his prima facie case, but then you look at the question of whether there was a legitimate, non-discriminatory reason for his discharge. And regardless of what the personal reasons that were interfering with his work were, it doesn't really matter. The fact is, the clients were dissatisfied. And the evidence shows that Randy Goldman, the Schwab representative, had been dissatisfied for a long time. In fact, months before, she'd asked for Mr. Drum to be removed from her account and replaced with the same account representative who eventually replaced him. So, no, we don't think that even if everybody involved knew for a fact that Mr. Drum was homosexual, that that would make any difference to the outcome of this case. And, in fact, we think that's consistent with the district court's decision. The district court found that the clients were complaining, that that was a serious issue, and that that was, in fact, the reason for Mr. Drum's discharge. But leaving that counterfactual aside, I mean, the question still remains, was there at the time. And we submit that the evidence in the record does not support that conclusion. Now, what evidence are they providing? The first and the only real direct connection with Ms. Resendez are some supposedly prying personal questions that Ms. Resendez made to Mr. Drum in the year prior to his termination. First of all, early in 2007, this occurred, was Mr. Drum's testimony, Ms. Resendez asked him whether he was dating anybody. Now, he later said in his declaration that he found these inquiries prying and different than anything Ms. Resendez had asked him before, and that he surmised from that that may have something to do with his sexual orientation, although even he concedes that that was speculation on his part. But I agree with Mr. Gauss that you have to look at context and you have to look at the reasons that people are asking these questions. There's also undisputed testimony in the record that at the time, Mr. Drum was going through a separation and divorce with his wife. At the time, Mr. Drum had confided in Ms. Resendez that his wife had begun dating another man. And in response to those questions, she asked him, well, are you dating? Now, leaving aside his characterizations or his perception of whether that was an appropriate inquiry, that doesn't really matter. The issue is it came up in the context of a specific statement by his wife. And in that context, these questions are not at all probative of the issue in this case, which is whether or not Ms. Resendez perceived him to be gay. The same thing can be said with respect to the second set of questions. Again, there were two questions in the fall of 2007 time frame regarding his health. It's undisputed in the record that Mr. Drum was, in fact, sick at the time. He had some sort of stomach ailment that required him to go to the emergency room, he had a number of doctor's visits, and he lost a significant amount of weight. He came to Chicago for a meeting at which he saw Ms. Resendez, and she asked him about his weight loss. She commented that he didn't look well. This is all documented in the record. Again, he characterized these inquiries as overly personal. But in the context, there was a clear reason for her to ask these questions, and they have nothing to do with whether or not Mr. Drum is gay. Sotomayor, I think we understand the point that you make. Thank you. Now, turning to the question of pretext again. Mr. Gauss made a significant point that the only problem at issue in the Schwab account was the issue of the red lines. The district court addressed this issue in its findings and noted that there were a number of problems that had been raised with the Schwab account in addition to the red lines. The emails are in the record outlining various problems with Mr. Drum responding to pricing issues, issues, things that had been negotiated not being included in the draft contracts. Again, Mr. Drum conceded that he is the face of this account. And that being the case, he's the one responsible, regardless of whether he has to rely on people on the back end to put these documents together, he's the one responsible for presenting them then to the client, and he's the one who's going to be, frankly, blamed if the client is not satisfied with those documents, because he's the one they're dealing with. Yeah, I think these are all pretty much contained in the district court. All right, thank you, Your Honor. If there are no more questions, I'll conclude my remarks. Thank you. Thank you. The we asked Ms. Goldman of Schwab, going into the October 12th meeting, and this is on supplemental excerpt of record 226, did you express to anyone at Morningstar that you were dissatisfied at Mike Drum at this time? She said, no, I was just dissatisfied that we didn't have a document that was usable. That's what every party says about this crucial period. And that was she was not targeting Mr. Drum. After the meeting, she became convinced that Mr. Drum was the problem. Why did you become convinced that Mr. Drum was the problem? Because Connie, she said, Connie called me and said, after the October 12th meeting, she hadn't realized in what bad shape the contracts were in at that point and indicated it was Mike's responsibility to provide me redlined agreements. And it wasn't. We have substantial evidence that he couldn't do it and he, as a matter of policy, wasn't responsible for it. Schwab asked for him to be removed when they, because they were told something that was not true on an issue that was of great importance at that time. That's the only reason Schwab asked for him to be removed from the Schwab account. And so on page 60 of the deposition, it says, And I indicated to Connie that Mike had been rude to my team, condescending, and had viewed them as employees. And she also said, but I never said anything before his removal. Right. That wasn't the reason. That was not the reason that she requested his removal. She said, I had this conversation after he was gone from the account. I sort of chased him out the door. The question is, what caused Ms. Goldman to request his removal? And we have shown with substantial evidence that it was false information, that he was responsible for a problem that was threatening the deal. And that was the only reason. And that other than that, at the time he was terminated, he was an outstanding performer, and on this deal, he had completed the deal without complaints by Schwab throughout 2007. Thank you. The case just argued is submitted for decision. We'll hear the last case on the calendar, which is Alperin v. Franciscan Order.
judges: Adelman, Schroeder, Thomas